**In the United States District Court for the Eastern District of Virginia**
**Alexandria Division**

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | |
| v. | ) | Case No. 1:24cr37 |
| | ) | Hon. Rossie D. Alston |
| **Najee Lewis,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>A Sentence of 37 Months for Mr. Lewis Fulfills the Purposes of Sentencing</u>**

For the last three years, Najee Lewis was as happy and successful as he had ever been. First incarcerated just after his 16th birthday, Mr. Lewis had found joy and fulfillment in his work delivering drywall, in the days he took his three-year old son Kyair every week, and in daily routines that involved cooking and commutes instead of chow hall and counts. Freedom meant he could take his aunt to doctor's appointments and his cousins to football practice.

Months after Mr. Lewis turned 16, he was the youngest of a group arrested for the armed robbery of a home. Years later, after he had returned home, a friend asked him to sit around and play video games in a music video – with a firearm on his lap. When the video aired, he was prosecuted for – and pleaded guilty to – felon in possession of a firearm. He received a sentence of 18 months. Presentence Report (PSR) at ¶42. Mr. Lewis's crimes were serious – but they were emblematic of his

1

youth.  The joint recommendation of 37 months is more than twice the length of his last sentence.[1]

Despite his recent success, Mr. Lewis was troubled, and he coped by drinking – drinking until he blacked out at least once or twice every week.  The night before he walked into Saks and attempted to shoplift a pair of jeans, he had blacked out. When he woke up in the morning, friends urged the group to keep the party going – for everyone to take more shots.  That is how Mr. Lewis ended up drunk and shoplifting while holding onto a friend's firearm.  When caught, Mr. Lewis never pulled the gun, never reached for it.  Case No. 1:20cr128, ECF No. 50 (Petition for Revocation of Supervised Release, hereinafter "Petition") at 3.  This was never going to be a robbery. Mr. Lewis immediately accepted responsibility, and over the last six months, in conversations with counsel, has come to accept that he is not going to be able to move forward – with work, with parenting his son – unless he continues to distance himself from his past and fundamentally changes his relationship to alcohol.

## Underlying Facts and Procedural Posture

On January 13, 2021, Mr. Lewis was released on a three-year term of Supervised Release. After clearing up state court probation warrants related to the music video, Mr. Lewis began Supervised Release on February 2, 2021.  Petition at 2. Over the course of the next 34 months, Mr. Lewis did as well as he'd ever done – he never violated Supervised Release.  The Court issued three No Action reports:

---

[1] While the Plea Agreement permits him to request a sentence of as low as 30 months, Mr. Lewis acknowledges that the joint recommendation of 37 months better reflects a just punishment under the circumstances.

one positive drug screen for marijuana and two violations for speeding.  Case No. 1:20cr128, ECF No. 50 at 2.  On December 3, 2023, Mr. Lewis was two months from successful completion of his Supervised Release when he was arrested for possession of a firearm and petit larceny.  *Id.* at 3.  The charges are telling: the firearm was not involved – there was no use of force, no use of the firearm, and no threat of either force or a firearm.  *Id.*  Mr. Lewis was shoplifting a pair of jeans, and, according to the petition, he "was apprehended immediately outside the store without issue."  *Id.*  The petition reflects that Mr. Lewis apologized to the Saks theft prevention team.  *Id.*

When Mr. Lewis was brought to federal court on a Supervised Violation, a new criminal case had been opened in Fairfax County on the petit larceny and possession of a firearm.  *Id.*  While Mr. Lewis was prepared to accept responsibility, counsel notified the government that Mr. Lewis could not plead guilty without consulting Mr. Lewis's state counsel – who would likely object to Mr. Lewis pleading guilty to the conduct in federal court before the state court had been resolved.  Mr. Lewis did not oppose any continuances necessary to resolve the case.

In late January, the government decided to take over the new criminal prosecution from Fairfax County and extended a plea offer to Mr. Lewis for violating 18 U.S.C. § 922(g).  Mr. Lewis accepted the government's offer and pleaded guilty to the new criminal matter on February 21, 2024.  ECF Nos. 4,5.  The parties agreed to request sentences between 30-37 months and that any sentence on the Supervised Release violation be run concurrent to the sentence in this case.  *Id.*

**1996-2013:**
**Mr. Lewis's childhood was split between different neighborhoods, both plagued by violence, gangs, and crime.**

Najee Lewis was born in New Haven, Connecticut on Christmas Day. PSR at ¶53. His father left his mother shortly after he was born and has been a non-presence in Najee's life ever since. *Id.* at ¶54. Najee did reach out to his father after his son, Kyair, was born in 2020 – having a child inspired him to take it upon himself to make the effort and connect with his family. *Id.*

Mr. Lewis did not report abuse or neglect during the Presentence Interview (*Id.*); however, his girlfriend writes that she doesn't "think [Mr. Lewis] was ever given a childhood, and the space to be a kid because he grew up with very little , his mother struggled after the father left during her pregnancy with him". Exhibit 1, Letter from Symone Johnson.

The area in New Haven, Connecticut where Mr. Lewis first grew up was plagued by gangs, drugs, and violence. Wanting a safer environment for Mr. Lewis and his brother, their mother, Latonya Ritter, moved the family to Dumfries, Virginia. Unfortunately, Mr. Lewis's friends and family were still plagued by violence after the move.

Growing up, Najee was very close with his brother, Barry, who was only a year older than Najee. Years later, seventeen-year-old Barry would cry when Najee was arrested and sentenced for the robbery. In school, Najee played sports – football, basketball, and wrestling. He was smart, and while his grades were unremarkable, he quickly earned his G.E.D. in juvenile prison. Perhaps most of all,

4

his mother described his magnetism: Najee was popular, and he was around, everyone would come to her house – nieces and nephews, neighbors, and friends.[2]

## 2013-2021:
## As a teenager, Najee Lewis entered into the street life that dominated his neighborhoods growing up.

Mr. Lewis had just turned sixteen years old when he was arrested for armed robbery in 2013. PSR at ¶41. While the sixteen-year-old Najee knew a gun would be present, he is not accused of using the gun or hurting anyone at any point. *Id.* The Prince William County Commonwealth's Attorney proceeded to certify the case so that sixteen-year-old Najee was tried as an adult. *Id.* After pleading guilty, Najee began a five-year prison sentence at the age of sixteen. *Id.*

In 2020, at the age of 23, Mr. Lewis was again arrested, this time for possessing a firearm himself. PSR at ¶42. According to the presentence report, Mr. Lewis possessed a … pistol while appearing in a music video… In the video, the defendant held the … pistol … in his lap." *Id.* While a firearm in a video certainly endorses violence, a gun on Mr. Lewi's lap was not the same violent imagery that is a constant presence in many other music videos. During the intervening time, there is no allegation that Mr. Lewis ever possessed, much less used, a weapon outside of the context of a music video.

There is no doubt that Najee's prior convictions were serious and that firearms are dangerous, but there is also no doubt his conduct in both cases was a

---

[2] This paragraph was based on counsel's March 27, 2024 interview with Mr. Lewis at her home in Fredericksburg, Virginia.

product of youth. The Supreme Court, courts in this district, and the Sentencing Commission have all reiterated the relevance of youth at sentencing.

In *Miller v. Alabama*, 567 U.S. 460, 471–72 (2012), the Supreme Court relied on neuroscience in holding that sentencing people to mandatory life without parole for crimes committed as juveniles violated the Eighth Amendment. The Court held that individuals under age eighteen have the possibility to reform as they grew older. *Id.* The Supreme Court has also recognized that youth is a profound mitigating factor when considering crimes committed by a teenager. *See Montgomery v. Louisiana*, 134 S.Ct. 718, 734 (2016) (citing the mitigation impact of the transient immaturity defining "youth").

Since *Miller*, courts have recognized that neuroscience research supports the proposition that people bear a lower degree of culpability for actions committed in their late teens and early twenties – and can weigh in favor of a sentence reduction. For example, in *McCoy v. United States*, 2020 WL 2738225 at *3 (E.D. Va. May 26, 2020), a court in this district granted a sentence reduction to a 36-year-old man convicted of 29 robberies he committed at age 19 because of his exemplary record in prison, his restitution payments, and "an ever-growing body of research in developmental psychology and neuroscience."

Most recently, in its Proposed 2024 Amendments to the Sentencing Guidelines, the United States Sentencing Commission has expanded the use of youth as a sentencing factor and added "language specifically providing for a downward departure for cases in which the defendant was youthful at the time of

the offense or prior offenses, and set forth considerations for the court relating to youthful individuals."[3]  In hindsight, this language weighs against the Commonwealth Attorney's 2013 decision to charge the 16 year old Najee as an adult.  The Commission cited research concluding "<u>that brain development continues until the mid-20s on average, potentially contributing to impulsive actions and reward-seeking behavior</u>, although a more precise age would have to be determined on an individualized basis."[4]

## 2021-2023:
## Mr. Lewis found stability and success in learning to be a working parent for the first time.

Once Mr. Lewis was released in 2021, he showed evidence that he had matured.  While his conduct in this case highlights that maturity isn't linear, there is ample evidence – in his work, in his parenting, in his sacrifice for others – that this was a more focused, more mature person than had committed the crimes at ages 16 and 23.

Upon release, Mr. Lewis immediately got a job at a Popeye's restaurant prepping and dumping the chicken in the fryer.  The job was close to his mother's house in Stafford, so even though he wasn't living with her, it meant he got to see her frequently.  While Mr. Lewis was always working, he says his most meaningful work was with drywall delivery, which he did for two different companies, Capitol Building

---

[3] *See* United States Sentencing Commission, *Amendments to the Sentencing Guidelines (Preliminary)* (April 17, 2024) at 15, available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202404_prelim-rf.pdf.

[4] *Id.* (emphasis added).

7

Supplies and L & W Supply. When pressed as to why he had "loved" drywall delivery, he described a fun, fast-moving environment. As opposed to other work he had done, drywall delivery had been dynamic – there was never any standing around. He hated standing around. He was always on the go, always moving with his team. They were in new places every day.

The work also added structure to his life. While his commutes were plagued by not having a car or long drives in traffic, it got him to bed early – which had never been a strong suit. It also established a routine – which he carried over to caring for his family and his son.

His family and friends write about how Mr. Lewis remained focused on others during this time. Perhaps most compelling is a letter to the Court from Lashawn Brown, Mr. Lewis's aunt. Going through a divorce, Ms. Brown moved from Connecticut to Virginia with her four young sons. *See* Exhibit 2, Letter from Lashawn Brown. To make ends meet, Ms. Brown works two full-time jobs. *Id.* According to Ms. Brown, Mr. Lewis "stepped up and made sure that [her sons] went to every practice and he was at every game cheering them on because I couldn't be there with them." *Id.* She writes that not only would Mr. Lewis help them get better at football, but he also helped them with homework and school projects. *Id.* She writes that the last six months "have been hard for me cause the one person that really took time out to show my sons what a father figure is, is now lock[ed] up for making the wrong decisions." *Id.*

His aunt, Laretta McMillan, suffers from seizures that doctors have been unable to explain or mitigate. *See* Exhibit 3, Letter from Laretta McMillan. First, Mr. Lewis accompanied Ms. McMillan to her doctor's appointments; then he began driving after Ms. McMillan experienced a seizure while driving, and Mr. Lewis had to reach to the floor and depress the brake pedal with his hands. *Id.* She woke up safe, with a tearful Mr. Lewis waiting for her to come to. *Id.* Since Mr. Lewis was arrested, Ms. McMillan has not had a consistent person to drive her to and from her appointments. *Id.*

And finally, there was Kyair. Mr. Lewis writes in his letter to the Court that he does not want to celebrate his performance of the everyday duties of fatherhood – that those should be taken for granted. *See* Exhibit 4, Letter from Najee Lewis. However, for someone whose youth had been marked by immaturity, Mr. Lewis made a decision to take fatherhood seriously. *See* Exhibit 1, Letter from Symone Johnson. Once he was released, he began taking baby Kyair every day while Kyair's mother was at work. Once Mr. Lewis began working, he started taking Kyair for weekends, which then moved to three to four days every week. Mr. Lewis took off work for Kyair's checkups and conferences with his daycare teachers. Mr. Lewis still calls Kyair's mother and speaks to him regularly. As Kyair's mother writes to the Court, "Kyair will be graduating his preschool program and has asked if his dad will be there. When I explained to him that's his father won't be able to make it he cried and said 'that's not fair'". *See* Exhibit 5, Letter from Dasha Houston; *see also* Exhibit 6, Photographs of Najee and Kyair.

9

Despite all of this positivity, there was stress lingering from Mr. Lewis's past. Although he was tried as an adult and sentenced to adult prison, certain people believed (incorrectly) that he had cooperated with law enforcement after the 2013 robbery. He also occasionally ran into the family of the robbery victims and people who knew them. He received threats. People looked at him strangely. People occasionally yelled insults as he passed. He had cut ties with many of the people and places in his past, but he felt a constant strain – was he in danger? Was his mother? Was his son?

Mr. Lewis also used drinking to cope with tragedy – which was everywhere around him. Mr. Lewis grew up in Dumfries, Virginia, an area plagued by violent crime. Last November, in the weeks before his arrest, Mr. Lewis was drinking more than usual as he coped with a slew of tragedies. On November 15, his friend Quatrail Smalls was shot and killed near Mr. Lewis's hometown of Dumfries.[5] Mr. Smalls and Mr. Lewis had known each other since they were 11 years old. The two had been close as teens – and then stayed close while they were both incarcerated in their late teens. However, Mr. Smalls was someone that Mr. Lewis had deliberately left behind when released from prison. Mr. Lewis knew that Mr. Smalls's life was likely to get him in trouble, and so Mr. Lewis made a decision not to see him: he didn't invite him to Kyair's birthday, didn't respond to social media messages that Mr. Smalls would

---

[5] Wood, Olivia, *26-year-old man shot dead in Prince William County. Now, police are searching for answers*, WJLA News (Nov. 15, 2023), available at https://wjla.com/news/local/virginia-crime-shooting-prince-william-county-26-year-old-man-shot-triangle-va-big-stone-gap-wharf-lane-homicide-investigation.

send. And with his death, Mr. Lewis felt both profound sadness at the loss of his friend – and guilt for not trying harder to bring Mr. Smalls with him into working life, life out of the streets. Looking back, it is easy for Mr. Lewis to see alternative versions of history where Mr. Smalls was working with Mr. Lewis delivering drywall – or another version where Mr. Lewis would have been standing next to him when he was shot.

The day after Mr. Smalls was killed was November 16, the anniversary of the death of Mr. Lewis's best friend, Christopher Weaver, who was shot and killed in 2014.[6] From when Mr. Lewis's family moved to Virginia until Mr. Lewis was arrested in 2013, the two were together every day – in the way that only childhood friends can be. Together in school, together after school, together in trouble, together making jokes and watching television at either home. Chris was shot and killed when Mr. Lewis was seventeen years old and in prison for the robbery conviction. The date is still a painful one for Mr. Lewis every year.

Finally, November 17, 2023 marked the one-year anniversary of the death of another of Mr. Lewis's friends, Javon Williams.[7] Williams, his girlfriend, and their dog were shot when his girlfriend's ex-boyfriend broke into their home in Dumfries

---

[6] *2 arrested in shooting death of Christopher Weaver*, WUSA (Nov. 20, 2014), available at: https://www.wusa9.com/article/news/local/virginia/2-arrested-in-shooting-death-of-christopher-weaver/65-285028191.

[7] Rogers, Winston, *Va. man pleaded guilty to killing ex-girlfriend, man, before trying to flee to Panama*, ABC News (Oct. 17, 2023), available at: https://wset.com/news/local/prince-william-county-man-guilty-killing-ex-girlfriend-man-dog-panama-dulles-airport-dumfries-woodbridge-virginia-commonwealths-attorney-va-flee-run-state-police-first-degree-murder-desmond-daniel-alyssa-gainey-javon-williams-justice.

11

through a window. Similarly, Mr. Williams had been a friend from growing up in Dumfries, and his death brough feelings of hopelessness, sadness, and guilt.

These three men are only the beginning of a long list of Mr. Lewis's friends and family who have died from gun violence. He has missed many of the funerals – and years of friendship – while incarcerated. In conversations with counsel, Mr. Lewis reflected on the constant presence and constant reminders of tragic loss. He discussed that from his cell at the Alexandria Detention Center, his own cycle from tragedy to drinking was clear. Another drink always held the potential for escape, for forgetting, for leaving tragedy behind.

To Mr. Lewis's credit, he stopped smoking marijuana while on supervised release – initially testing positive because he misunderstood marijuana's legality in Virginia to extend to supervised release. But he would drink on the weekends, and once he started, he would not, could not stop. He would black out every weekend. It was rare to remember a Saturday night.

He did not see it at the time: he was succeeding at work, he was spending time with Kyair, he was staying away from illegal drugs, he was not getting arrested for driving under the influence or public intoxication. He was walking the line. He was succeeding as an adult – with work, with his son, with the law. The drinking meant Sundays were slow and sometimes painful, but that was it. That ended with this arrest, his only arrest since his 2021 release, and it occurred after he had been drinking for 12 hours.

Upon his release, Mr. Lewis plans to enter treatment to explore the effects of alcohol on his life and to identify tools for managing both alcohol and tragedy. In the meantime, he asks that the Court recommend BOP's evidence-based Residential Drug Abuse Program (RDAP) to allow him to begin doing that work.

## Conclusion

The Court will likely notice a contrast between Mr. Lewis's assessment of his father in the presentence report and Mr. Lewis's letter to the Court. In the presentence interview, Mr. Lewis told the Probation Officer that "his father is not someone who takes responsibility for anything, and they only communicate once in a while when the defendant makes contact". To his credit, Mr. Lewis has taken responsibility for his conduct, for his drinking, and for the hole he will be leaving in the lives of his son, his cousins, and his aunt – of everyone that cares about him. He has taken responsibility that his decisions are his own – and does not attempt to excuse his actions with tragedy or alcohol. He suggested that counsel not request the lowest sentence the plea agreement allowed. This acceptance will be imperative going forward – as he takes responsibility not only for his past – but also for what comes next, for getting treatment, for getting back into his son's life every day. Mr. Lewis respectfully requests that this Court sentence him to the joint recommendation of 37 months and recommend to the Bureau of Prisons that he participate in the Residential Drug Abuse Program.

Dated: May 22, 2024	Respectfully submitted,

/s/
Nathaniel Wenstrup
Assistant Federal Public Defender
Virginia Bar No. 96324
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0825 (telephone)
Nate_wenstrup@fd.org
